## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2931 | **DATE** | 4/16/2004 |
| **CASE TITLE** | John Joseph Schulz vs. Varian Medical Systems, Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant's motion for summary judgment is granted. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | | | |
| ✓ | Docketing to mail notices. | | | | APR 19 2004 | |
| ✓ | Mail AO 450 form. | | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | date mailed notice | |
| RO | | courtroom deputy's initials | | | | |
| | | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN JOSEPH SCHULZ,                   )
                                      )
    Plaintiff,                    )
                                      )
    v.                            )    No. 03 C 2931
                                      )
VARIAN MEDICAL SYSTEMS, INC.,         )    Judge Ruben Castillo
                                      )
    Defendant.                    )
                                      )

DOCKETED

APR 1 9 2004

## MEMORANDUM OPINION AND ORDER

John Joseph Schulz ("Schulz") sued Varian Medical Systems, Inc. ("Varian") claiming

discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-

34. Schulz brings both a wrongful termination claim under 29 U.S.C. § 623(a) and a retaliation

claim under 29 U.S.C. § 623(d). Varian now moves for summary judgment on both claims. For

the reasons set forth below, the Court grants Varian's Motion for Summary Judgment. (R. 15-1.)

### RELEVANT FACTS[1]

Varian manufactures linear accelerators and ancillary equipment used with linear

accelerators. (R. 16, Def.'s Facts, ¶ 5.) Varian also has a customer support organization that

provides services and repairs to this equipment. (Id. ¶ 7.) Schulz began working for Varian in

December 1985 as an entry level Customer Service Representative and he was promoted to the

---

[1] When replying to Plaintiff's Rule 56.1(b)(3)(B) Statement of Additional Facts, Defendant also replied to Plaintiff's Reply to Defendant's Rule 56.1(a)(3) Statement of Undisputed Facts (Plaintiff's 56.1(b)(3)(A) Statement). Plaintiff filed a Motion to Strike these fifty-three additional responses. (R. 26-1.) Such a reply is inappropriate. *See Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1000 n.2 (N.D. Ill. 2002) (stating that "such a submission by Defendants is neither appropriate nor necessary under the Local Rules"); *Rocket v. Marten Transp. Ltd.*, No. 99 C 3957, 2001 WL 1155256, at *2 n.2 (N.D. Ill. Sept. 28, 2001); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Therefore, Plaintiff's Motion to Strike is granted. (R. 26-1.)

second level of Customer Service Representative in March 1990. (*Id.* ¶ 13.) In approximately 1989, the Order of the Sisters of St. Francis ("OSF"), a large hospital located in Peoria, Illinois, bought equipment from Varian and entered into a service contract with Varian. (*Id.* ¶ 14.) As a result of the large amount of revenue that would be generated by this service contract, Varian created a full-time position for a single service representative in the central Illinois (Peoria) area. (*Id.* ¶ 15.) Schulz applied for this position, received it, and began work in July 1990. (*Id.* ¶¶ 16, 17.)

From July 1990 through December 2001, Schulz worked in the central Illinois area under the supervision of Tom Mirocha ("Mirocha"). (*Id.* ¶ 18.) Schulz was the primary Varian representative for servicing OSF machines at this time and thus was required to reside in central Illinois, even though he reported to Varian's Des Plaines office. (*Id.* ¶ 18.) In 1994 Schulz was promoted to Senior Service Representative. (*Id.* ¶ 19.)

Beginning in early 2000 and up to his termination on October 15, 2002, Schulz received several documented disciplinary actions. On February 28, 2000, Schulz received a documented verbal warning from Mirocha for failing to perform mandatory scheduled service on customer machines in a timely manner and for failing to complete field service reports. (R. 20, Pl.'s Facts, ¶ 21.) Additionally, in July 2001, Schulz received a second documented verbal warning from Mirocha for the same reasons. (*Id.* ¶ 22.)

In late 2001, Varian's contract with OSF expired.[2] (R. 16, Def.'s Facts, ¶ 26.) Around this time Varian underwent a district realignment, and Ford Weinhammer ("Weinhammer")

---

[2]The parties dispute the reason why OSF did not renew the contract. Varian maintains it was Schulz's poor performance, (R. 16, Def.'s Facts, ¶¶ 23, 24, 29-32), while Schulz maintains it was Varian's failure to assign more service representatives, (R. 20, Pl.'s Facts, ¶¶ 23, 24, 29-32).

2

became Schulz's new supervisor. (*Id.* ¶¶ 27, 28.) Because there no longer was a position in central Illinois, Weinhammer and his supervisor, Regional Manager Wayne Walker ("Walker"), decided to offer Schulz an open position in the Chicago area. (*Id.* ¶¶ 30, 34, 35.) Sometime before February 16, 2002, Weinhammer told Schulz that he would have to relocate his residence to Joliet if he wished to have this position and retain his employment with Varian. (*Id.* ¶ 37.)

On February 16, 2002, Weinhammer gave Schulz a memo entitled "Relocation to the Chicago Area," which informed Schulz that he had to relocate to the Joliet area by June 1, 2002. (*Id.* ¶ 38.) On March 27, 2002, Weinhammer sent Schulz an e-mail asking him to send the signed relocation agreement by overnight delivery. (*Id.* ¶ 40.) Around April 2, 2002, Schulz informed Weinhammer that he would undergo some medical tests on April 4, 2002. (*Id.* ¶ 41.) On April 4, 2002, Weinhammer requested that Schulz sign the relocation agreement and send it to him immediately. (*Id.* ¶ 41.) On April 5, 2002, after still not receiving the relocation agreement, Weinhammer issued a verbal warning to Schulz for insubordination as a result of Schulz's failure to submit the relocation agreement. (*Id.* ¶ 43.) Schulz never submitted a signed copy of the relocation agreement. (*Id.* ¶ 46.)

On April 8, 2002, Weinhammer sent Schulz a memo entitled "Relocation Confirmation" reiterating that Schulz needed to move by June 1, 2002. (*Id.* ¶ 47.) Schulz did not relocate by June 1, 2002; in fact, he spent June 1, 2002, and the following two weeks on vacation in Colorado. (*Id.* ¶¶ 48, 49.) Subsequently, Weinhammer sent Schulz a memo entitled "Relocation - Final Notice," informing him that he had to move by August 10, 2002 and that his failure to relocate by then "[would] result in action by Varian which may or may not be agreeable to you." (R. 20, Pl.'s Facts, ¶ 50.) On August 9, 2002, Schulz informed Varian that he had a "proposed

address" at an apartment in Joliet; as of this date he had paid his August rent but had not yet moved. (*Id.* ¶¶ 51, 52.)

Additionally, on July 9, 2002 Schulz received a written warning for his failure to communicate with Varian's dispatch. (*Id.* ¶ 55.) Dispatch is a centralized system designed to distribute calls from customers to service representatives. (R. 16, Def.'s Facts, ¶ 56.) In order to do this efficiently, dispatch needs to know the location of Varian's customer service representatives. (*Id.*) Thus, all service representatives are required to update dispatch when they move locations or experience a change in status. (*Id.*)

On September 18, 2002 Schulz was placed on thirty days probation for failing to call Team Leader Barry Lemcke ("Lemcke") prior to 8:30 a.m. each day and for exercising poor judgment in informing a customer that he could not service its machine because his car was being serviced. (*Id.* ¶ 57.) Varian informed Schulz that while on probation he had to successfully perform all aspects of his job or he could be terminated. (*Id.* ¶ 64.) Thereafter, Weinhammer informed Walker and Varian's human resources managers of Schulz's continued performance deficiencies while on probation. (*Id.* ¶¶ 65, 66.) On October 15, 2002 Schulz was terminated for violating his probation. (*Id.* ¶¶ 66, 68.)

Varian has a fair treatment policy that states that an employee "has the right to request that the issue be reviewed through the Fair Treatment Process." (R. 20, Pl.'s Facts, ¶ 72.) This policy was made available to all Varian employees in 2002. (R. 16, Def.'s Facts, ¶ 73.) The policy provides that an employee should first seek to resolve a work-related problem through discussion with his immediate supervisor and a human resources representative. (*Id.* ¶ 74.) If

4

this does not lead to a solution, then the employee should bring the problem to the next higher level of management.[3] (*Id.*)

On October 1, 2002, Schulz spoke with Keith Krugman ("Krugman"), Varian's Vice President of Oncology Systems. (R. 20, Pl.'s Facts, ¶ 76.) Schulz never told Krugman that he thought he was being treated differently because of his age, although Schulz did tell Krugman that Schulz was being subjected to different standards than his colleagues. (*Id.*) Subsequently, on October 3, 2002, Schulz spoke with Doug Cook ("Cook"), Varian's National Service Manager. (*Id.* ¶ 80.) Schulz never told Krugman he thought he was being treated differently because of his age. (*Id.*) In fact, from September 16, 2002, until October 15, 2002 (his termination date), he never told anyone that he thought he was being treated differently because of his age. (*Id.* ¶ 81.)

For each of the disciplinary actions taken against Schulz, he either offers reasons as to why the discipline was unfairly imposed or attempts to explain away the reason. With respect to the February 28, 2000 documented verbal warning, Schulz points out that in 2000 he had an average score on customer satisfaction surveys of 92%, and that based on his 2000 performance he received a 4.18% merit increase from Mirocha. (*Id.* ¶¶ 20, 21.) He also contends that he consistently left the required documentation, and that by February 2002 Mirocha acknowledged that any issues with Schulz failing to perform mandatory scheduled service in a timely manner had been resolved. (*Id.* ¶ 21.)

---

[3]Schulz objects to the introduction of this information on relevance grounds. Fed. R. Evid. 401-02. Given the liberal standards of Rule 401, and the fact that Schulz complained to two supervisors, this policy is clearly relevant.

Schulz disputes the July 2001 documented verbal warning by asserting that he left all necessary documentation on-site and that he performed mandatory scheduled service in a timely manner, unless he was required to assist other service representatives outside of his primary region. (*Id.* ¶ 22.) He also notes that he received a 3.5% merit-based pay increase based on his performance in 2001 and that he had a 93% customer satisfaction rating at that time. (*Id.* ¶ 22.)

Concerning the verbal warning for insubordination, Schulz maintains that when he received the relocation agreement, Weinhammer told him they would meet to sign it after he had reviewed it and considered its terms. (*Id.* ¶ 39.) Schulz claims that he did not immediately send the relocation agreement back to Weinhammer because: (1) he believed they needed to more fully discuss its terms; (2) he was working at least eleven hours per day servicing an Iowa customer; and (3) he experienced chest pains that required him to take time off beginning April 3, 2002. (*Id.* ¶ 40.) Furthermore, according to Schulz, after he explained his medical situation on April 2, 2002, Weinhammer told him that he should "not worry about the relocation letter" and that he should focus on his health first. (*Id.* ¶ 41.) Schulz also claims that his medical condition prevented him from returning the relocation agreement on April 4, 2002. (*Id.* ¶ 42.) Finally, Schulz asserts that Weinhammer, by issuing him this warning, discriminated against him because of his age. (*Id.* ¶ 43.)

Schulz explains his failure to move to the Joliet area by June 1, 2002 by noting that from April 8, 2002 until May 31, 2002 he was servicing customers in excess of forty hours per week. (*Id.* ¶ 48.) He also argues that while he may not have moved by August 9, 2002, Walker allowed him to have more than one residence as long as he was present in the newer territory during times required for servicing customers. (*Id.* ¶ 52.)

Schulz disputes the underlying reason for his July 9, 2002 written warning for failure to communicate with dispatch on July 2, 2002. He claims that when he received the call from dispatch, he went straight to the customer's site. (*Id.* ¶ 55.)

Schulz also disputes the reasons he was placed on probation. He claims that there was confusion as to what time he was supposed to contact Lemcke. Prior to April 16, 2002 he was told to contact Lemcke by 9:30 a.m. and was also told there was no firm deadline. (*Id.* ¶ 59.) He further claims that on April 16, 2002 Lemcke sent Schulz an e-mail telling him to contact Lemcke no later than 8:45 a.m. every day and that on September 12, 2002, Lemcke sent him an e-mail stating, "I am reminding you again that I need an update of you're [sic] status no later than 08:30 am." (*Id.* ¶ 59.) Schulz maintains that from September 16, 2002 until his termination he called Lemcke each workday by 8:30 a.m. (*Id.* ¶ 61.)

Schulz was also placed on probation for exercising poor judgment in informing a customer he could not service its machine because his car was being serviced. (R. 16, Def.'s Facts, ¶ 62.) Weinhammer's district guidelines require that when a service representative is on duty and his company vehicle is unavailable, the service representative needs to maintain other arrangements, such as renting a car or using his own personal vehicle. (*Id.* ¶ 62.) Schulz claims that these guidelines did not apply in this instance. (R. 20, Pl.'s Facts, ¶ 62.) He notes that Varian does not have a written policy stating when vehicles may be serviced and that it is possible for a service representative to repair his vehicle on company time. (*Id.*) Finally, Schulz states that he brought his vehicle into service beginning at 7 a.m. and informed the customer he could not respond immediately. (*Id.* ¶ 63.) After the customer spoke with him and Lemcke, the

problem was resolved by 8:30 a.m. (*Id.*) His vehicle was repaired by 9:45 a.m., and he visited the customer later that day to prevent further problems. (*Id.*)

Varian stresses three distinct actions by Schulz that violated his probation. (R. 16, Def.'s Facts, ¶ 65.) First, Varian claims that Schulz refused to cross-train another service representative. (*Id.*) Schulz claims that this representative, John Kraciun ("Kraciun"), was in California and that Schulz was never informed when Kraciun returned. (R. 20, Pl.'s Facts, ¶ 65.) Second, Varian claims that Schulz refused to follow basic trouble-shooting steps in servicing a customer's machine leading to the customer's dissatisfaction. (R. 16, Def.'s Facts, ¶ 65.) Schulz claims that he requested a technical specialist's help which was necessary to address the problem, but that Weinhammer initially cancelled this assistance. (R. 20, Pl.'s Facts, ¶ 65.) Third, Varian claims that Schulz failed to set up voice mail on his home and cellular telephones in a timely manner so that he could be reached. (R. 16, Def.'s Facts, ¶ 65.) Schulz claims that he has was told this at 9:00 a.m. on September 30, 2002, and that his voice mail was operational by 6:45 p.m. the same day. (R. 20, Pl.'s Facts, ¶ 65.) Schulz claims that at this time he was working in a facility that did not allow cellular telephone transmissions and did not provide him with a land line. (*Id.*)

Finally, Schulz maintains that on September 20, 2002, Lemcke informed him that after Varian lost the OSF account Weinhammer and Walker wanted him replaced with somebody younger who they could mold to their desires. (R. 20, Pl.'s Facts, ¶ 70.) Schulz also maintains that Weinhammer knew that he had spoken with Krugman on October 1, 2002, before the decision to terminate him was made. (*Id.* ¶ 78.)

8

## LEGAL STANDARDS

Summary judgment is appropriate only when the record, viewed in the light most favorable to the non-moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Self-serving assertions, without factual support in the record, cannot be used to defeat a motion for summary judgment. *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 941-42 (7th Cir. 1997). Instead, the party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The role of the Court is to determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Finally, where a party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," no genuine issues as to any material fact can exist. *Celotex*, 477 U.S. at 323.

## ANALYSIS

### I. Wrongful Termination Claim

Under the ADEA it is unlawful for an employer to "discharge any individual...because of such individual's age." 29 U.S.C.A. § 623(a) (1999). The ADEA applies to individuals who are forty years of age or older. 29 U.S.C.A. § 631(a). A plaintiff can prove that he was discriminated against on the basis of age by either the direct or the indirect method. *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir. 1998). Using the direct method, a plaintiff can use either direct or circumstantial evidence to establish age discrimination. *Id.* Using the

9

indirect method, a plaintiff proceeds through the burden-shifting method set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Id.* Schulz only relies on the indirect method. (R. 19, Pl.'s Resp. at 3.)

Under the indirect method, a plaintiff must first establish a prima facie case of age discrimination. If the plaintiff can establish a prima face case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. If the defendant articulates a non-discriminatory reason, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was pretextual. *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999); *Richter*, 142 F.3d at 1028. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### A. Prima Facie Case of Age Discrimination

To establish a prima facie case of age discrimination, a plaintiff must show that: (1) he was a member of the protected class; (2) he was meeting the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated differently than a similarly situated, substantially younger employee.[4] *Richter*, 142 F.3d at 1028. In order to survive summary judgment, a plaintiff needs to demonstrate a triable issue as to each element of his prima facie case. *Griffin v. Potter*, 356 F.3d 824, 828 (7th Cir. 2004) (citation omitted). Furthermore, a plaintiff needs to establish his prima facie case by a preponderance of the evidence. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

---

[4]As Schulz's position was not filled after his termination, the fourth element of his prima facie case is not whether he was replaced by a younger employee, but whether a younger employee was treated more favorably. *See Collier v. Budd Co.*, 66 F.3d 886, 890-91 (7th Cir. 1995).

The parties agree that Schulz can show elements one and three of his prima facie case. Schulz was older than forty years old when he was terminated; he was forty-two. (R. 20, Pl.'s Facts, ¶ 13.) Additionally, he suffered an adverse employment action by being terminated on October 15, 2002. The parties dispute whether Schulz can establish the second and fourth elements of his prima facie case.

### 1. Varian's Legitimate Expectations

It does not matter that Schulz's past behavior met Varian's legitimate expectations, for the issue is whether "the employee was performing well at the time of [his] termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)). Thus, neither prior pay raises nor prior customer surveys show that an employee was meeting his employer's legitimate expectations. *See Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 (7th Cir. 1998) (stating that "past raises and bonuses do not prove that [the plaintiff] was meeting [the defendant's] legitimate expectations *at the time of his discharge*") (emphasis in original).

In arguing that he met Varian's legitimate expectations, Schulz states that based on his performance in 2000, he received a 4.18% merit-based wage increase and had a 92% customer satisfaction rating. He further states that based on his performance in 2001, he received a 3.5% merit-based wage increase and had a 93% customer satisfaction rating. Moreover, Schulz attempts to explain why his February 28, 2000 and July 2001 documented verbal warnings were unjustified. Finally, Schulz offers reasons as to why he was not responsible for Varian's loss of the OSF contract. The Court need not analyze whether these imposed disciplines were justified or whether Schulz's merit based wage increases are indicative of satisfactory performance because

11

all of these events occurred significantly before Schulz's termination. It is settled law that the issue is whether Schulz was performing well at the time of his termination. It is thus his conduct closer to his termination date that warrants further inquiry.

Schulz admits that: (1) he received a verbal warning on April 5, 2002, for insubordination for not submitting the relocation agreement; (2) he failed to move to the Joliet area in a timely manner; (3) he received a written warning on July 9, 2002, for failing to communicate with dispatch; (4) he was placed on probation on September 18, 2002; and (5) he was terminated on October 15, 2002 for violating his probation. Schulz, however, disputes the basis of these disciplinary actions.

Schulz relies on *Noble v. Sheahan*, 132 F. Supp. 2d 626 (N.D. Ill. 2001), for the proposition that he can establish that he was meeting Varian's legitimate expectations by showing that the disciplinary actions were unwarranted. Schulz's reliance on *Noble* is misplaced. In *Noble*, the Court found a material fact dispute based on the plaintiff's affidavit and "categorical denial of Defendants' disputed allegations." *Id.* at 636. We noted "the unusual circumstances of this case in which Defendants utterly fail[ed] to provide any undisputed or preexisting evidence that Noble was not meeting their legitimate expectations...." *Id.* Here, unlike *Noble*, Varian has provided ample evidence that Schulz was not meeting its legitimate expectations.

A "nonmoving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) (quoting *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994)). However, "conclusory statements in [the plaintiff's] affidavit [or deposition] do not create an

issue of fact." *Id.* (quoting *Sample v. Aldi Inc.*, 61 F.3d 544, 549 (7th Cir. 1995)). Rather, a plaintiff "must do more than challenge the judgment of [his] superiors through [his] own self-interested assertions because [t]he employee's perception of [him]self...is not relevant. It is the perception of the decision maker which is relevant." *Id.* (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337-38 (7th Cir. 1991)). To survive summary judgment, a plaintiff must "specifically refute the facts which allegedly support the employer's claim of deficient performance." *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995). We will address each of Schulz's responses to the four disciplinary actions imposed upon him as well as his reasons for not moving to Joliet.

### a. Verbal Warning of April 5, 2002

Schulz was given the relocation agreement on February 16, 2002. As of April 5, 2002 he had not submitted it (and in fact, never did submit it) and was thus issued a verbal warning for insubordination. Accepting Schulz's belief that Weinhammer told him they would meet to sign it after he had reviewed it and considered its terms, it is difficult to see why the agreement was not signed by April 5. Furthermore, Weinhammer sent Schulz an e-mail on March 27, 2002 asking him to return the relocation agreement. Schulz claims that they needed to further discuss the terms, that he was working eleven hours per day, and that he had to take time off beginning April 3, 2002. These reasons, however, do not refute Varian's claim of deficient performance; rather, they are merely excuses as to why Schulz did not return the relocation agreement. Thus, Schulz has not shown that he was meeting Varian's legitimate expectations.

### b. Relocating to the Joliet Area

The relocation agreement informed Schulz that he needed to relocate to the Joliet area by June 1, 2002. Schulz did not move by this date and, in fact, spent the following two weeks on

vacation in Colorado. Subsequently, Weinhammer informed Schulz that he needed to move no later than August 10, 2002. On August 9, Schulz informed Varian that he had a "proposed address" at an apartment in Joliet, but he had not yet moved. The fact that he took a two-week vacation to Colorado instead of moving to the Joliet area further demonstrates that he was not meeting Varian's legitimate expectations.

### c. Failing to Communicate with Dispatch

Schulz was also issued a written warning on July 9, 2002 for failing to communicate with dispatch. Schulz maintains that he did communicate with dispatch. Even though Schulz has not offered any undisputed factual information to the contrary, he has created a disputed issue of fact with regard to whether he communicated with dispatch. This fact, however, is not material because we have already found that Schulz was not meeting Varian's legitimate expectations with regard to the other disciplinary actions.

### d. Being Placed on Probation

Schulz also disputes the reasons Varian put him on probation. Varian states that he was placed on probation for failing to call Lemcke prior to 8:30 a.m. each day and for exercising poor judgment in informing a customer that he could not service its machine because his car was being serviced. There is some confusion as to what time Schulz was required to check in with Lemcke. Schulz maintains that, in response to Lemcke's September 12, 2002 e-mail, he called Lemcke before 8:30 a.m. from September 16, 2002 until his termination. He further maintains that from July 18, 2002 until September 13, 2002 he contacted Lemcke prior to 9:30 a.m. Lemcke's e-mail of April 16, 2002, however, stated "[p]lease try contact me no later than 8:45 a.m. every day." It is unclear, notwithstanding Lemcke's April 16, 2002 e-mail, if Schulz could check in as late as 9:30 a.m. Accordingly, Schulz has created a disputed factual issue as to

14

whether he was checking in with Lemcke on time. Again, however, this fact is not material because Schulz was not meeting Varian's legitimate expectations with regards to other disciplinary problems.

Varian's second reason for placing Schulz on probation is less subject to a factual dispute. Varian claims Schulz exercised poor judgment in informing a customer that he could not service its machine because his car was being serviced. Weinhammer's district guidelines require that in this situation Schulz needed to make other arrangements such as renting a car, or using his personal vehicle. Schulz claims that these guidelines do not apply to him, but fails to offer the Court a reason as to why they do not apply to him. In failing to do this, Schulz has merely offered an excuse and has failed to create an issue of material fact.

### e. Violating Probation

Schulz also disputes some of the facts surrounding his probation violations. Varian highlights three distinct actions by Schulz that violated his probation. First, he refused to cross-train another service representative, Kraciun. On September 18, 2002, Weinhammer asked him to cross-train Kraciun. Schulz contacted dispatch on September 20, 2002 and learned that Kraciun was in California. He asked dispatch to leave a message for Kraciun, but he did not receive notification that Kraciun returned from California on September 23, 2002. On September 25, 2002 Schulz informed Weinhammer that he could not train Kraciun. Finally, Schulz claims that Weinhammer knew Kraciun was back on September 23, but that he failed to inform Schulz of Crucian's return. (R. 20, Pl.'s Facts, ¶ 65.) Schulz could not train Kraciun if he did not know that he was back from California, and thus Schulz has created an issue of fact, but once again this issue of fact is not material because of Schulz's other disciplinary problems.

The second action by Schulz that violated his probation was his refusal to follow basic trouble-shooting steps in servicing equipment at Mason & Hanger leading to the customer's dissatisfaction. Schulz maintains that a technical specialist was needed to resolve this problem, but he does not dispute the fact that he failed to follow basic trouble shooting steps.

The third and final action by Schulz that violated his probation was his failure to establish voice mail on his home and cellular telephones. There is some dispute as to whether Schulz was ever requested to establish voice mail before September 30, 2002; Varian claims that he was instructed to do this while Schulz claims that he was not. On September 30, 2002, Schulz was requested to set up voice mail on both phones at 9:00 a.m.; however, it was not until 6:45 p.m. the same day that he had established voice mail on his cellular phone. In explaining the delay, Schulz claims that he needed a land line to set up his voice mail, and apparently the site he was at did not allow him to use a land line. However, this does not explain why it took him over nine hours to establish his voice mail. Once again, Schulz has simply offered excuses as to why he did not do what was requested of him. He has not refuted the fact that he was not meeting Varian's legitimate expectations.

In short, although Schulz does refute some of the facts involving his discipline and his moving to the Chicago area, the vast majority of his efforts are merely ineffective excuses. This is insufficient to establish that he was meeting Varian's legitimate expectations by a preponderance of the evidence, and Schulz has thus failed to establish this prong of his prima facie case.

### 2. Treatment of Similarly-Situated Substantially Younger Employees

Schulz must also prove that similarly-situated substantially younger employees received better treatment than he did. *Richter*, 142 F.3d at 1028. In a disciplinary case "in which a

16

plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason...a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). This entails showing that the two employees had the same supervisor, were subject to the same standards, and engaged in similar conduct without circumstances that would distinguish their conduct. *Id.* at 617-18. Finally, a plaintiff can use evidence of more lenient discipline being imposed on similarly-situated employees outside the protected class. *Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001).

The first question is whether any of the employees that Schulz claims are similar to him actually are similarly situated to him. If there are, then the issue becomes whether they are substantially younger than Schulz. Schulz only specifically lists Lemcke as a similarly-situated employee, (R. 19, Pl.'s Resp. at 10), although in his 56.1(b)(3)(B) statement, Schulz also lists Regina Hoffman, (R. 20, Pl.'s Facts, ¶ 177). He further states that "[y]ounger representatives [had] also been the subject of customer complaints without any resulting discipline," but does not name any specific employees. (R. 19, Pl.'s Resp. at 10.)

Schulz concedes that no other service representative under Weinhammer's supervision was subject to discipline in 2002. In maintaining that Lemcke was similarly situated to him, he states that Lemcke failed to notify dispatch of his status on at least three distinct occasions in 2002 and that his voice mail was not operating on the same day that Weinhammer requested Schulz to establish his voice mail. Varian disputes that Lemcke's voice mail was not working on that day; Lemcke testified that his voice mail never malfunctioned during 2002. (R. 16, Def.'s Facts, ¶ 162.) Varian further disputes that Lemcke failed to notify dispatch on these three occasions. (*Id.* ¶ 179.) Even if all of Schulz's arguments are accepted, he still does not come

17

close to establishing that Lemcke was similarly situated to him. Schulz had numerous disciplinary actions imposed upon him in 2002, but has failed to direct the Court to any disciplinary actions imposed upon Lemcke. Therefore, Schulz and Lemcke were not similarity situated.

Even assuming that Lemcke was similarly situated to Schulz, he would still have to demonstrate that Lemcke is substantially younger than him. In *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 892-93 (7th Cir. 1997), the Seventh Circuit explained that a ten-year age difference would be presumptively substantial. If the age difference is less than ten years, a plaintiff must "direct[] the court to evidence that her employer considered her age to be significant." *Id.* at 893; *see also Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659-60 (7th Cir. 2001); *Richter*, 142 F.3d at 1028-29. Lemcke was born on July 13, 1963, making him three years older than Schulz. Thus, even if Lemcke was similarity situated to Schulz, as he is *older* than Schulz, Schulz cannot use him to show that similarly-situated substantially younger employees received more favorable treatment.

Schulz also maintains that Hoffman (who reported to Mirocha) was similarly situated to him. Schulz claims that difficulties between her and a customer led to Mirocha removing her from servicing the customer temporarily. (R. 20, Pl.'s Facts, ¶ 177.) Again, whereas Hoffman received no formal discipline, Schulz received formal discipline several times in 2002. Accordingly, Hoffman was not similarity situated to Schulz either.

As to Hoffman's age, Schulz did not provide her date of birth, but Varian states that she was born on February 1, 1944, making her fifteen years *older* than Schulz. (R. 16, Def.'s Facts, ¶ 177). As she is older than Schulz, he cannot rely upon any favorable treatment she received to show that substantially *younger* employees received more favorable treatment.

18

Finally, Schulz notes that other younger representatives were not disciplined for maintaining a large amount of costly parts. (*Id.* ¶¶ 188-90.) Schulz, however, was not disciplined for this behavior, and Varian did not factor it in to its decision to place him on probation or to terminate him. It logically follows that no one could have received better treatment than Schulz for maintaining a large inventory of parts because no one was disciplined for this conduct.

Schulz could circumvent this ten-year requirement by "direct[ing] the court to evidence that [his] employer considered [his] age to be significant." *Hartley*, 124 F.3d at 893. The only conceivable evidence that Schulz has provided showing that Varian considered his age significant is Lemcke's alleged comment on September 20, 2002 to Schulz that Weinhammer and Walker wanted him replaced with somebody younger who they could mold to their desires after Varian lost the OSF account. Lemcke denies making this statement. (R. 16, Def.'s Facts, ¶ 175.) More importantly, this statement is hearsay, and accordingly cannot be used to defeat a motion for summary judgment. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (stating that evidence that does not "fall within any of the myriad exception to the hearsay rule...[cannot] be considered in the summary judgment proceeding").

Consequently, even if Schulz had shown that he was meeting Varian's legitimate expectations, and even if he had shown that Lemcke or Hoffman was similarly situated to him, he has failed to make out a prima facie case of discrimination because neither Lemcke nor Hoffman is substantially younger than him. Accordingly, his age discrimination claim must fail.

**B. Varian's Reason for Schulz's Termination**

Even if Schulz could establish a prima facie case of discrimination, he cannot show that the reasons offered by Varian for his termination were pretextual, and thus this Court must grant

summary judgment for Varian. Varian has brought forth a non-discriminatory reason for Schulz's termination: his poor discipline record in the months leading up to his termination. To establish that Varian's reason is pretextual, Schulz must show that his Varian did not believe the reason it gave for the action. *Richter*, 142 F.3d at 1029. A plaintiff "may make the requisite showing by providing evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001) (internal quotations and citations omitted). Moreover, the Seventh Circuit has stated that a "reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Richter*, 142 F.3d at 1029-30. Finally, in attempting to show pretext, "[a] party's own deposition can constitute affirmative evidence to defeat a summary judgment motion." *Collier*, 66 F.3d at 892 (internal quotations and citations omitted). A plaintiff must, however, "support his allegation of pretext with material of evidentiary quality." *Id.* at 892 n.8 (internal quotations and citations omitted).

In alleging that Varian's reasons for terminating him were pretextual, Schulz essentially relies upon the same arguments that he used to maintain that he was meeting Varian's legitimate expectations. Additionally, Schulz states that the "disputed facts also reveal a plan by Weinhammer and Regional Director Walker to terminate Plaintiff because of his age." (R. 19, Pl.'s Resp. at 11.) The basis for this allegation appears to be Lemcke's alleged comment that Weinhammer and Walker wanted him replaced with somebody younger. Schulz also maintains that concerning relocation, "Weinhammer created documentation to create the impression that Plaintiff was insubordinate...." (*Id.* at 12.)

20

The Court concludes that Schulz has not provided evidence that Varian's proffered reasons are factually baseless. While Schulz has disputed the reasons for his discipline, he has not shown them to be without any factual support. Additionally, Schulz has not shown that Varian's proffered reasons were not the actual motivation for his termination. Lastly, we note that both Walker and Weinhammer, whom Schulz claims have an agenda to discriminate on the basis of age, are both eleven years *older* than Schulz. (R. 16, Def.'s Facts, ¶¶ 27, 30.) "While not dispositive, [the Seventh Circuit] has found it significant that individuals alleged to have discriminated on the basis of age were themselves members of the protected class." *Richter*, 142 F.3d at 1032.

Even if Schulz could establish a prima facie case of age discrimination, he cannot show that Varian's reasons for his termination were pretextual. Therefore, Varian's Motion for Summary Judgment is granted on Schulz's wrongful termination claim.

## II. Retaliation Claim

Even though Schulz's wrongful termination claim failed, he may still pursue his retaliation claim for complaining about age discrimination. *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 612 (7th Cir. 2001). Under the ADEA, it is "unlawful for an employer to discriminate against any of his employees...because such individual...has opposed any practice made unlawful by this section, or because such individual...has made a charge...under this chapter." 29 U.S.C. § 623(d) (1999). In assessing Schulz's retaliation claim, the Court follows the standard clarified in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002).

A plaintiff can establish a prima facie case of retaliation using either the direct or the indirect method. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Schulz only

relies on the direct method to prove his retaliation claim. Under the direct method, a plaintiff can use either direct or circumstantial evidence. *Id*; *see also Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102, 1115 (N.D. Ill. 2003). Under the direct method, a plaintiff must first establish that he: (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that there is a causal connection between the two. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). If the plaintiff's evidence is contradicted by the defendant, then the case must proceed to trial "unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway." *Id*.

### A. Statutorily Protected Activity

It is undisputed that Schulz's termination was an adverse employment action. Thus, Schulz must establish by either direct or circumstantial evidence that he engaged in a statutorily protected activity and that there is a causal connection between his activity and his termination. Examples of engaging in statutorily-protected conduct include filing a charge of discrimination with the E.E.O.C. or initiating litigation. *Horwitz*, 260 F.3d at 612. Informal grievances to supervisors are also sufficient. *Hubbard v. Blue Cross Blue Shield Ass'n*, 1 F. Supp. 2d 867, 881 (N.D. Ill. 1998) (citation omitted). Schulz claims three instances of engaging in statutorily protected activity: (1) opposing the disciplinary action taken by Weinhammer during 2002 including his concerns about becoming the new David Adams;[5] (2) asserting to Vice President Krugman on October 1, 2002 that he was being subjected to different standards than his

---

[5]David Adams was a former Varian employee apparently working in the Chicago area. In his deposition testimony in response to a question about why he thought Weinhammer had an agenda for age discrimination, Schulz responded that he believed this because he was replacing David Adams. Although Adams' age is not in the record, it appears that he was younger than Schulz. (*See* R. 16, Def.'s Facts, ¶ 71 (stating that "[p]laintiff believed that Dave Adams was younger than he was")). Schulz did not dispute this.

colleagues; and (3) Lemcke's alleged statement that Weinhammer and Walker wanted him replaced by a younger employee. (R. 19, Pl.'s Resp. at 13.) Lemcke's alleged statement, however, does not constitute statutorily protected activity by Schulz, so the Court will proceed to analyze only his first two cited actions.

Schulz relies solely on *Hubbard* for the proposition that he does not need to have mentioned age discrimination specifically in his complaints to his employer in order to establish that he engaged in statutorily-protected behavior. Schulz's reliance on *Hubbard* is misplaced. In *Hubbard*, although the plaintiff never explicitly mentioned that she was complaining of sexual discrimination, she asked her employer "why the women los[t] their office[s] and the men didn't." *Hubbard*, 1 F. Supp. 2d at 881. The employee's remark was an objective sign that at the time the complaint was made, she believed she was questioning conduct in violation of Title VII. *Id.* Unlike the employee in *Hubbard*, Schulz admits that from September 16, 2002 to October 15, 2002 he never told anyone that he thought he was being treated differently because of his age.

Schulz claims that he engaged in statutorily-protected activity when he opposed Weinhammer's disciplinary action and voiced his concern about becoming the new David Adams. Schulz, however, has not specifically stated which part of his opposition is statutorily protected. In fact, Schulz admits that his written response to the relocation agreement did not challenge Varian's reasons requiring him to relocate. (R. 20, Pl.'s Facts, ¶ 42.) Furthermore, voicing a concern about becoming the new David Adams cannot be considered statutorily-protected activity because Adams was younger than Schulz.

Schulz also states that he engaged in statutorily-protected activity when he complained to Vice President Krugman on October 1, 2002 that he was being subjected to different standards than his colleagues. This statement is still too generic to rise to the level of statutorily-protected

23

activity. Unlike in *Hubbard,* where the plaintiff referenced gender in her question, Schulz concedes that he made no mention of age discrimination in his telephone call to Krugman. Therefore, Schulz has failed to show that he engaged in a statutorily-protected activity. Accordingly, he has failed to establish the first element of his prima face case.

### B. Causal Connection

If the Court were to find that any of the three statements identified by Schulz were statutorily protected, Schulz would still need to demonstrate that there was a causal connection between his statements and his termination. In order for a plaintiff to show a causal connection, he must show "that the employer would not have taken the adverse action 'but for' the protected expression." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 938-39 (7th Cir. 1996). The Seventh Circuit has further noted that it can be difficult to infer causation based solely upon the timing of the protected statements and the adverse employment action. *Horwitz,* 260 F.3d at 613. Instead, a plaintiff "must produce facts which somehow tie the adverse decision to the [plaintiff's] protected actions." *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 918 (7th Cir. 2000) (holding that three months is too long). Once again, the Court will proceed to analyze only the causal connection between his first two cited actions and his termination.

It appears that Weinhammer made the comment about Schulz "becom[ing] the new Dave Adams" in April.[6] Even if he made this comment at the very end of April, a time period of five and a half months elapsed between his comment and his termination, which is too long to find a

---

[6]Schulz was asked the following questions: "How do you know [Weinhammer] has an agenda for age discrimination? What is your basis for stating that?" Schulz responded: "With the facts that are unfolding before me at this point in time for the April time frame, seeing a younger person that I'm being asked to replace, quote, 'become the new Dave Adams,' and to move into Dave's old area." (R. 16, Def.'s Facts, ¶70.)

causal connection. Accordingly, even if this statement were protected, Schulz has not demonstrated a causal connection between it and his termination.

The second instance warrants more careful consideration, as a period of only two weeks elapsed between Schulz telling Vice President Krugman that he was being subjected to different standards than his colleagues and Schulz's termination. Schulz also informed Krugman that he did not want Weinhammer to know that he had made the call. (R. 16, Def.'s Facts, ¶ 164.) At some point after Schulz and Krugman spoke, Krugman and Cook spoke, and Krugman informed Cook that Schulz was having an issue with Weinhammer. (*Id.* ¶ 165.) On October 2, 2002, Weinhammer sent an e-mail to Walker and some human resource personnel inquiring as to whether Schulz's performance deficiencies warranted his termination. (R. 20, Pl.'s Facts, ¶ 170.) On October 3, 2002, Cook told Schulz that there was a personality conflict between him and Weinhammer. During this conversation Schulz also asked about ensuring protection from retaliation, and Cook responded, "Well, it's a little late for that. You're talking to me because your job is on the line." (*Id.* ¶ 167.) At the meeting on October 15, 2002, where Schulz was terminated, Weinhammer stated that he did not care that Schulz had spoken with both Krugman and Cook. (*Id.* ¶ 173.)

Schulz argues that it can be inferred from his October 3 conversation with Cook that Cook recommended that Weinhammer terminate him prior to Weinhammer's October 2 e-mail. Schulz does not include any objective evidence that such a conversation occurred. Even if this did occur, Schulz has failed to establish that Varian would not have terminated him but-for his phone call to Krugman. Therefore, even if he engaged in a statutorily-protected expression, he has failed to demonstrate a causal connection between that expression and his termination. Thus, Schulz cannot sustain his claim of retaliation.

## CONCLUSION

For all of the foregoing reasons, we grant Varian's Motion for Summary Judgment on both of Schulz's claims. (R. 15-1.) While it is most unfortunate that Schulz's long career with Varian ended with a series of miscommunications and disputes, the Court concludes that the undisputed facts do not warrant a full jury trial in this lawsuit because no rational jury verdict could be upheld in Schulz's favor.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 16, 2004**